Good morning, Counselor. Good morning, Your Honor. Deja vu. Deja. I think it's quieted down, I think. Oh, you can go ahead. Okay, Your Honor. Good morning, and may it please the Court, my name is Caitlin Hudiman. I'm here today on behalf of the State of Louisiana. Over the past year and a half, the District Court here has entered three preliminary injunctions aimed at regulating the farm line at Louisiana State Penitentiary, or LSP. Each of those injunctions has suffered from various legal infirmities under both the PLRA and the Eighth Amendment, though we have brought this to this Court's attention each time via appeal. However, both of the prior injunctions expired by operation of law under the PLRA before this Court issued a merits decision. Now, however, due to the expedited schedule, the legal errors the District Court continues to commit may finally be solved. The State urges this Court to reverse the August 22nd order on any one of three independent bases and stop the District Court's micromanagement of LSP. The first two of those three reasons for reversal deal specifically with the prison litigation reform act. Let me just stop you, not to deter your argument, if you do, I'll give you some more time, but just the practicalities, just for a moment, and again, if I take from your time, I'll give you the time, but just the practicalities, you know, on this. When we started this, we were in the summer, literally, right? This is my third go-around with this case, as you well know, and it was in the, you know, in the 90s, the temperature was what it was, etc., etc. You know, we're now in November, temperatures are there. By no means, this is not a question whether the practicalities are mooting anything. That's not where I'm going, but I think what an emotions panel, so somewhere in between, state the injunctions, right? We've got pending, I think one of the emotions panels in between, state the injunctions in between the mootness. So, status quo is, the action below the state of the emotions panel, it froze everything, so we're back up here, all these others, but in reality, so I guess in reality, even though the temperature has changed, the measurements aren't still occurring, is that right? Yes, the August 22nd order that we're talking about today has been stayed by a state panel of this court as of, I believe, a month or so ago, a couple weeks ago. Practically speaking, yes, the temperatures have abated outside. I think in the most recent heat report that was entered into the district court record, it's a required joint report from the parties, there was one day in the second to last week of October where the temperature actually reached that heat index of 88 degrees. I don't think it's expected to reach that heat index again. I'm not a scientist, so I won't guess too much about that, but there is no current, pending, renewed motion for injunctive relief by the plaintiffs at this point, and I think that mirrors what happened after the first injunction, where plaintiffs said, you know, the temperature is changing and it's no longer a concern over the winter months, and so they didn't seek that second preliminary injunction motion until March or April of this year, because they were anticipating higher temperatures. Okay, that's something, as I said, if you get your hand up right now, I'll give you two minutes, but I just wanted to contextually get the sense of what's going on or not on the ground, so to speak, not suggesting that the legal issues raised are mooted by that, but just to have a real-time context with the farm line and what's really going on. I understand that, Your Honor. It is important to recognize the practical implications of this order, and that's one of the reasons this is so important to us, even despite the fact that the temperatures are lessening and that there is no currently pending, renewed motion for injunctive relief. This is still incredibly important to the state for a very specific reason and a very broad reason. Broadly speaking, we're talking about the Middle District of Louisiana here who's issuing these orders. All our cases about LSP are brought in the same district, so even though this injunction is about to expire and there's no one waiting in the wings like there was last time, it's still incredibly important to the state that we get a clear framework and clear binding precedent reinforcing, say, your prior holding in Hines County that established what is required under the PLRA, because we believe the district court is not following that precedent. On a more specific scale, the district court still has this case. We're not at a final judgment yet, and we anticipate that the plaintiffs will seek final permanent injunctive relief, and so it's important to us that the district court, if it decides to enter that permanent injunctive relief, abides by the PLRA and the proper 8th Amendment. There is a trial date, right? There is. There is an amended scheduling order issued, I believe a few weeks ago, that sets a five-day bench trial beginning on February 3rd of 2026 in front of Judge Jackson. Okay. All right. Press ahead. Let me ask you one thing. I looked at the policies of Van Gogh about the heat, and the heat alert business only goes through October. It doesn't even cover November. I believe that's correct, Your Honor. I mean, so was the injunction tied to the policies, or in other words, does the injunction relate to anything in November? That's a good question, Your Honor. I think the injunction just broadly states that the heat alert, whenever it's going to be called, must be called when the heat index reaches or exceeds 88 degrees Fahrenheit. So whether or not that is tied to a date, it's not included in the injunction itself. The district court simply said, LSP, when you call a heat alert, you must do so at 88 degrees, not at 91 degrees. So, I mean, the President apparently doesn't even monitor the heat after October 31. And if that is the case, then that cuts against the continued relief contained in this order. Our point about the increase from 88 to 91 degrees ties into our third argument here, which is about the Eighth Amendment analysis that the district court conducted. In doing so, the district court sort of put on blinders and focused in on our single decision to raise the heat alert from 88 to 91 degrees. In exercising out that one decision from our overall response to the district court's prior orders and the plaintiff's allegations, it failed the Eighth Amendment analysis. It slumped it. Isn't the, you know, the meat, the Eighth Amendment issue, isn't that what's the subject of the trial? That will be a large portion of the trial. There are also, I believe, ADA and Rehabilitation Act claims. Because in these proceedings leading up to this, we haven't dealt with the Eighth Amendment. My sense was that's what, if it gets to that point, is what the trial would be about. I mean, there were other issues, but the Eighth Amendment claim is the heart of what the farmland procedures themselves, right? Whether or not they're unconstitutional under the Eighth Amendment, but none of those issues have been before us in this preliminary stage. It's the state's urging, you know, violation of PLRA, etc., etc. The only reason that this court, Your Honor, has not been able to address our Eighth Amendment arguments thus far is because the injunctions keep expiring before you have an opportunity to do so. We've raised Eighth Amendment merits arguments to each one of these injunctions. In the first Vote 1 injunction, we just raised them the alternative because that injunction had already expired. So our argument there focused on mootness and vigor. In Vote 2, we raised almost identical arguments to what we raised here because the Vote 3 injunction is literally a copy and paste regurgitation of the findings in the Vote 2 injunction. So we've raised those Eighth Amendment merits issues, and they are still important at the preliminary injunctive stage, even though there is a Because what the district court is doing is demanding relief, ordering relief, based on a faulty legal basis, which is that faulty Eighth Amendment analysis. Well, I mean, parenthetically, I mean, we just, it's highly unlikely we would, in the stages we've been in, address the Eighth Amendment claims. We would have carried them with the case, really. I mean, whatever else we would have done in between ruled on those but would have carried the Eighth Amendment issue with the case, assuming that once doing whatever the court did, it remained viable. You follow what I'm saying? We wouldn't have issued an exegesis on the Eighth Amendment claim, and this motion stays knowing that there's a trial, hence when all of that's going to be thrown out. I understand what you're saying, that you, the state, has maintained it along the way for the panels and all. I'm just saying, given the reality test, the most that would have happened would have been carrying that issue with the case to be threshed out on the law. It wouldn't mean to get you bogged down. The only point I'll make in response to that, Your Honor, is that while that may be the case, this is a very niche Eighth Amendment violation that the district court conducted, and it does have real legal implications on LSP at the preliminary posture. So that's why we're bringing this, and that's why we're asking you to reverse, potentially on that basis, potentially on a PLRA basis. Did you squarely, I may have detoured you, did you squarely address the point Judge Davis raised about the November? I believe so, but if you have any other questions, I'm happy to keep going on that. No. Okay. I'll turn back to the PLRA issues, because I think they're very important, both to the state and to this case specifically. First, the issue of successive injunctions. We teed up this issue all the way back in Vote 1, because under the PLRA, its plain text does not permit the sort of identical, successive, repeated injunction that this court issued on August 20th. There's nothing in the text that expressly says thou shalt not, right? Not necessarily, Your Honor, but I think to say that this court can do so would be to blatantly ignore what is included in subsection A2. Subsection A2, the second half of that subsection, provides one procedural path for so-called extending or carrying on preliminary injunctive relief, and that requires two things. The court has to make the needs, narrowness, and truesomeness findings, and it has to make that preliminary order final. The district court said, oh, well, that's one procedural path that I could take, but plaintiffs are proposing this other path, and I'm going to take that one instead. But the PLRA doesn't have another path. It has that one, and it's to make the order final, and the district court didn't do so. Everyone agrees that the Vote 2 order was not made final, and yet it lives on in the August 22nd order. The district court copied and pasted its analysis. There's a big old block quote about the factual determinations that were made back in May that it relies upon and fully incorporates into its August 22nd order. But you're not arguing the court had to make it, quote, final in the sense of a permanent injunction, though, right? We do believe that that is how you make it final, is by making it a permanent injunction, and there are other... You're saying at that stage the court would have had to... I didn't see any cases where they had accepted that interpretation. Many courts have done successive preliminary injunctions. Did you find anywhere they refused to do it? As to this specific argument we're raising right now, there is not a lot of case law on it. We have one published opinion from the Ninth Circuit that weighs in plaintiff's favor. But there are a lot of district courts that have done that. I think there are some district courts who have implicitly sanctioned repeated injunctions, but none of them have grappled with the argument that we are making today and have actually analyzed the text, the history of the PLRA, its purpose, in the way that we believe is necessary to come to the proper conclusion, which is that you cannot issue successive identical injunctions like this, because it's a workaround. It's a workaround of making the injunction final, and it's a workaround that 90-day expiration period. When it comes to final meaning permanent, we do have case law in our favor on that. There's a bit of a split on it, but the DC Circuit and Bates v. Booth, the Eleventh Circuit, even the Ninth Circuit, and I think it's the Allman opinion, says that to make it final means to make it permanent. And our point there is that the district court here has ignored that unless clause and has ignored the 90-day limit in simply reissuing its same relief a day after the previous relief expired, and that is not permitted by the circuit. And I'd like, if I could, to point your Honor's attention to the Georgia Advocacy Office v. Jackson opinion from the Eleventh Circuit. It was vacated on settlement grounds. We recognize that it's not controlling or overly persuasive in that sense, but its merits analysis is incredibly detailed. Come on, if a case vaporizes, counsel, I mean, you know, if the case vaporizes because mandates held, the case is settled. Now that's gonna be the push, right? The case vaporized because they settled the case in body. So that's it. Then on the other hand, you don't want us to follow the Ninth Circuit because it said what it said, right? Right. So I mean, yeah, the Eleventh Circuit, but I mean, you're acknowledging the case vaporized. I completely acknowledge that, Your Honor. My only point is that if you're looking for an exegesis on this issue, the Eleventh Circuit conducted it, and it didn't vacate that part of its analysis. Once the case goes in body. I understand, Your Honor. And didn't it ultimately just hold that a preliminary injunction, preliminary injunctions respecting prison conditions expire after 90 days by operation of law unless district court makes additional need-narrowness-intrusiveness findings and enters a permanent injunction. We conclude that the preliminary injunction here expired long ago. So it basically held what the statute says. I completely agree with that, Your Honor. My reference to that is how it got there. It talks about the PLRA and how rather than, if you remember old case law says to change the traditional equitable remedies a federal court has, we must have the clearest command from Congress. What the Eleventh Circuit does in that opinion is explains how the PLRA gives that clearest command. It expressly limits federal courts equitable discretion in this area, and it does so in a number of ways. And one of the ways that it flushes out in that opinion is that 90-day limit. How it changes how preliminary injunctive relief would typically work to prevent harm until the final judgment on the merits, to prevent harm for 90 days. It expressly tabits that, tabits that relief. But it doesn't address the issue we have here, which is whether you can have successive or more than one preliminary injunction. Yes, and I very much agree. Sorry, I'm running out of time. May I answer your question? No, no, no. Hang on. Counselor, yeah, I absorbed at least a minute of her time myself. Give her three minutes. I mean, it's a hefty case. It's a case on expedited appeal. It's specially set. The ink is still wet on the briefs and the whole shmeal. So give her three minutes and to your argument if I need to do something on the other side, I know how to do that. Okay? I appreciate it, Your Honor. To your point, Judge Ramirez, no, there is not a lot of case law talking about the specific argument we're making here, which is that successive identical preliminary injunctions are not permitted under the PLRA. I would say the only clear case law we have on that is on the Ninth Circuit and it does favor plaintiffs. Our point there is that they conducted no textual analysis at all in coming to that conclusion in May Weathers. But the case wasn't vaporized. It was not vaporized, Your Honor. But they used about brief sentences to say nothing in the text prohibits this use and then they quote A2 in a parenthetical at the end. Our point is that the better view, actually based on the full text of the PLRA, its context, its twin aims of those curbing federal courts equitable discretion and expediting the lifecycle of these prison litigation cases, is that these type of successive injunctions are not permitted under the PLRA. I'll move on from that issue with this time I have left to talk about our other argument under the PLRA, another base for reversal of this August 22nd order, which is that the district court continued again to ignore the required Mead, Nairn, and Isatrus Smith findings under the PLRA, didn't reference 3626, didn't attempt to make those findings at all, and under this court's opinion in Hines County, we know that the district court must conduct that particularized analysis in order to have the injunction survive under the PLRA. Plaintiff's response here is largely to say that A1, which applies to perspective relief, and A2, which applies specifically to preliminary relief, have vastly different language and that if the court is issuing preliminary relief, it doesn't have to make any findings at all under the PLRA for that relief to be valid. Our position is that that reading is completely divorced from the text. Section A1a applies to all perspective relief. It says no court shall grant perspective relief, should not grant or approve any perspective relief, unless it makes the required findings. That any has no qualifications. It applies to all perspective relief, and in fact if you look at the definition section of the PLRA, 3626 subsection G7 defines perspective relief as all relief that is not monetary damages, does not distinguish between preliminary, permanent, interlocutory, final, and then relief itself is defined in G9 as all relief in any form. None of this mandates or suggests that there should be line drawn between permanent and final, excuse me, permanent and yes, and final relief. So if the court had expressly enunciated, I am doing this per section 3626, in other words, if it expressly mouthed the words this portion of the statute, would you say that was okay or you still would say that was okay? I'm just making sure. I'm not trying to run over. Trust me, I know how to run this light. Trust me, I've got it. But I'm just saying, you know, none of the cases we've read give language saying, okay, the district court figures the same judge, different somebody inherited the case, but it's the same judge, same parties, same issues, et cetera, and our cases say, well, we don't require talismanic language, et cetera. So what is it in the text of the PLRA then would say in this context before the district court can do anything else, he or she must say the words, this is 3626A1, if otherwise, you know, what is enunciated, and that's the argument that counsel opposite makes is that the text of the statute, which you're relying on heavily, doesn't contain the words saying that if the district court does, you know, do something else, it must restate that, but it must be narrow, non-intrusive, et cetera, et cetera. So I'm just saying, oh, you're asking us to hold it. In this instance and in any instance, if the district court is acting, it must expressly say 3626A1, anything short of that is a violation of PLRA. Do you understand my question? I do, Your Honor, and kind of two responses there. Where we find that requirement that the court say these things is in A1. It requires the court to make these findings, but this court itself in Hines County said that a mere citation wouldn't be enough and a summary conclusion that, and yes, that satisfied these requirements wouldn't be enough. This court in Hines County said we need particularized findings, and it's not about, you know, the incantations or the talismanic language. It's about explaining the basis where it's holding under the very strict confines that the PLRA has placed on the perspective relief it's allowed to issue. Okay. All right. Thank you. You've reserved your vote. All right. Thank you, Ms. Cranbo. Before you, you know, dive in, what's kind of your threshold response to the question I asked and the one that Davis asked about the, you know, sort of the real-time temperature on the ground, November, etc. I mean, that's not something we asked y'all to address beforehand. You ever thought? Absolutely, Your Honors. This actually supports our point. The stay must be lifted in this instance. Keep your voice up, please. Of course. A little louder. What this means is that the stay must be lifted because plaintiffs have fewer protections now that defendants have essentially stopped their heat alert policies because the heat season, as they say, has ended. But it's not 90-plus degrees, so what are you saying? Well, what the farmer and Helling and all these Supreme Court cases ask is about the risk of harm. The actual temperatures are not relevant in this instance when we're looking at the risk of harm, and I'll point this court to November 7th of 2024, almost this exact date last year, the temperature actually exceeded 91 degrees. So, you know, what we're looking at and what we're forecasting over the next couple of days does not mean that there is not still a risk to men on the farm line. We had an ice storm in Shreveport in February the 18th of 2024, but I'm not surmising that we're going to have ice storms, you know, in Shreveport. I'm being facetious, but I'm saying it happened, but I'm not governing my life around the notion. You understand what I'm saying? That we're going to have ice storms in February. It just kind of doesn't happen. So you're saying because it's exceeded in November, late November of 2024, that ought to auger against the probable likelihood that temperatures are going to be much, much lower in those months. We provided the district court in the prior proceedings with a chart, actually, that laid out all of the times over the last three years that the temperatures exceeded 88 degrees, a heat index of 88 degrees, and there were, I think, 11 days or seven days, depending on which weather station you looked at, over the last three years. So that's not an insignificant number, and the district court was right in crediting that evidence in support of our proposition that there is a serious risk of harm if men on the front line are not provided these adequate protections. All right, well, you can go back to your main arguments, although I don't remember hearing that argument in terms of, I don't even think there still would be taken temperatures and all that, but I don't want to cut you off. You've got plenty to argue, or need to argue. Let me just ask one just question first. Doesn't the preliminary injunction expire by November the 10th? The preliminary injunction is indeed set to expire on November 20th. 20th, okay. Yes, and plaintiffs don't dispute that the injunction will expire at that time. We're not planning to seek an extension or an additional injunction at this time. We're very much looking forward to a trial. So is that what we're dealing with? Will we extend or lift the stay between now and November 20th? Plaintiffs are hoping to have the stay lifted between now and November 20th and believe that there's a serious risk of harm if the stay is not lifted between now and then. Well, if this case moots out like the rest of the day, and I'm not saying that's the case, but you know, if this one moots out on November the 20th, the stay is still there. The temperatures are lower, but you still have a trial date. Would that be accurate? That would be accurate, and you know, we're again, we're not contesting that that injunction would be moot as of that time. Okay, press ahead. All right, well, I didn't have a chance to introduce myself. My name is Kimberly Cranbo. I'm with Paul Weiss. I'm joined by my co-counsel, Samantha Forshaw of the Promise of Justice Initiative. So I'd like to offer you all a roadmap briefly before you jump in with questions, laying out why the August order was proper, both under the Eighth Amendment and the PLRA. So first, as to the successive injunctions issue, the equitable powers of a district court can only be displaced by the clearest of congressional commands, and there's no clear command barring a successive injunction under the PLRA, or successive preliminary injunction under the PLRA, and no court has ever held as such. Defendants are unable to point to any case supporting their proposition that there is only a single bar, or there's only one single preliminary injunction permitted over the course of an entire class action prison litigation. Second, as to the need, necessary, and non-intrusiveness factors, I'll refer to them as the NNI factors throughout for brevity, a 90-day preliminary injunction under subsection A2 of the PLRA is not prospective relief, and is not subject to the requirements for prospective relief under subsection A1. These are distinct categories of relief with very distinct and intentional language. A2 simply requires that relief must be NNI, and this order was. Third, with regards to the merits, defendants are correct that the court primarily focused its deliberate indifference analysis on finding that the heat, or it focused its analysis on where the heat alert threshold sits, but it did this for a very good reason. The district court found that the heat alert threshold is the only heat protection that really matters. Essentially, it's the umbrella under which all of these other remedial measures that DOC discusses in their briefings sit, and the district court explicitly found that until a heat alert is triggered, there are no mandatory medically significant protections being provided to men on the farm line. The court found that defendants' choice to raise the heat alert threshold from 88 degrees Fahrenheit, which they had maintained for years prior to the instigation of this litigation, to 91 degrees against clear, deliberate indifference, and that is more than sufficient under the Eighth Amendment. Now, I welcome your additional questions. Otherwise, I can proceed to discussing the successive injunctions piece. Again, we discussed that there's no case law supporting a bar on successive injunctions, and I'd like to underscore for the dire consequences of defendants' position here. Essentially, what they're advancing is that in a complex class action prison litigation that could potentially last for years, plaintiffs are limited to a single preliminary injunction of 90 days, and after that, they are out of luck, or they must jam their entire litigation and proceed to a final judgment, a permanent injunction within that single 90-day period. The consequences of that reading would be dire, and there is no way that Congress intended to force plaintiffs to choose between foregoing their constitutional rights during the pendency of a litigation or jamming their entire litigation into a 90-day period. Second, there is no textual basis for barring successive injunctions. The explicit text of A2 itself says that preliminary injunctions are permitted to the extent otherwise authorized by law. I've already discussed the clear command required to displace a district court's traditional equitable authority to issue preliminary injunctions. Now, defendants point to the unless clause, that last sentence of subsection A2, to argue that after that first preliminary injunction expires after 90 days, the court must enter a permanent injunction. Now, this court does not need to decide what is required to extend a preliminary injunction under the PLRA. That is not on the table here. In this instance, we're talking about a successive preliminary injunction that will last only 90 days. Plaintiffs concede that that injunction is going to expire on November 20th. We're not planning to seek another at this time. And of course, the idea that extension, this is functionally an extension of the prior order. The May order has also expired. Extension is different because it's taking that same order, making the A1 findings, and allowing that order to last more than 90 days. Versus in this instance, the district court issued a new successive order, re-evaluated whether or not the preliminary injunction factors had been satisfied, whether the relief continued to be NNI, and issued another 90-day preliminary injunction. Now, I'll move on to the- Counsel, before you do- Of course. You just said that the district court examined the factors and issued another- I think you're talking about the third injunction. Is that correct? I'm referring to the third injunction, which incorporated in full the factual findings and conclusions of law from the May order. What is there in the record to reflect what the court looked at or did in order to reach its conclusion? From my reading of the docket, there's a status conference. It doesn't reflect a hearing on the third injunction. And then you see the order. The motion for renewed injunction doesn't have any evidence. How do we know what the district court considered as a basis for issuing the third injunction? Your Honor, the district court explicitly incorporated the reasoning, the factual findings, and the legal conclusions from the May order, finding that there had been no change in fact or law from the May injunction. In fact, defendants conceded in the last oral argument that we had here that there had been no subsequent changes on the farm line over the course of the summer. I agree that's what it says. But what is there for us to determine what it looked at to find that nothing had changed? There's no evidence saying nothing's changed. There are no affidavits. There's no hearing with testimony. How does the court decide that nothing's changed? The parties did not dispute that nothing had changed. Plaintiffs and defendants both argued on the basis of the same facts, the same law, that all the facts should still be applicable to the next order. In the motion. In the motions and response. In the motions and response. There were no additional facts raised in that motion practice. You're saying the defendant didn't contest that more was needed in order to establish the necessity for a continued or a successive or a new preliminary injunction, whatever you want to call it. They challenged it, obviously, but they didn't raise additional protections, for example, that they were putting in place halfway through the summer. They continued to stand by the same policies and practices that were advanced in the May briefing. As to the NNI issue, as I mentioned briefly, the NNI factors are simply not, the district court was not required to make findings as to the NNI factors for an initial issue of a 90-day preliminary injunction because preliminary injunction is not prospective relief. By its text, A2 does not require findings. As Judge Stewart pointed out, it simply says that the relief must be NNI. But beyond that, not only does it require that the relief must be NNI, but as opposed to subsection A1, which requires that the relief be found to be NNI with respect to violation of a federal right, subsection A2 has different and intentionally different language requiring only that the relief be NNI with regards to that the relief extend no further than necessary to correct the harm the court finds requires preliminary relief. Now, there is no requirement in A2 that a district court issuing a preliminary injunction needs to find that there's been a violation of a federal right, and our position is that this was an intentional choice on Congress's part to establish a lower burden for a district court in issuing a preliminary injunction. We have Supreme Court precedent saying that it would be inappropriate for a district court to be making an evaluation that something is necessary to correct a violation of a federal right in a preliminary injunction proceeding. Those proceedings are typically happening on an expedited basis and on the basis of less formal procedures and evidence. Congress intentionally laid out a lower threshold, not requiring NNI findings, not requiring a violation of a federal right in order for a preliminary injunction to issue. Defendant's read of the statute would also create surplusage in that last clause of A2, that unless clause, if A1 findings are required for an A2 preliminary injunction, it would eliminate this two-step procedure that the unless clause set out for making a 90-day preliminary injunction final. Congress wanted the court to make A1 findings twice. Why wouldn't it make the A1 findings again? Lastly, I know you heard an earlier case about the statutory interpretation canon of lex specialis and the general governing the specific. Lex specialis applies here even if the court is not convinced that preliminary injunctive relief is not prospective relief. Lex specialis means that plaintiffs still win and that there are no findings required. Prospective relief in this case would be the general provision. Preliminary injunctive relief being the specific. Preliminary injunctive relief does not require findings and general provision does where they conflict the general seeds to the specific and no findings are required. Of course, defendants did cite to the Georgia advocacy case. Not only was that case vacated pursuant to settlement, but it was vacated while the mandate was being withheld, suggesting that a member of the 11th circuit had requested a poll on whether or not to hear that case en banc. So there's also a substantive question as to court's reasoning and conclusions in that case as well. So we would have to agree that preliminary injunction is necessary between now and November 20? Respectfully, Your Honor, you could find that under Lex specialis findings are still not required, even if you find that prospective relief doesn't come with preliminary injunction. I'm not talking about the findings made, but I mean, how is it reasonable for us to say that it's necessary between now and November 20? Well, Your Honor. I mean, is it likely that he is going to have a heat day between now and November 20? Respectfully, Your Honor, that's not the standard at issue here. Essentially, what the district court looked at was a mountain of evidence that said that as temperatures rise above 88 degrees Fahrenheit and based on a record that showed that there was a likelihood that temperatures are going to exceed that point over the course of the month of November. Don't we have to look at any circumstances as they exist when we hear the case? Yes, Your Honor. But again, we're only looking at a risk of serious and substantial bodily harm. And those risks are incredibly serious. It's still 80 degrees. The temperature could continue to rise. That's again, not really the question. This court is evaluating a risk of harm and that risk is at issue here when temperatures rise above 88 degrees Fahrenheit. And I'll also remind you that we're talking about heat index here, which is a slightly different thing than when you're just looking at the weather channel. Heat index is a combination of humidity and actual temperature. So the heat index on the farm line might differ from what you're feeling here in the courtroom and what you're reading on your thermometer. And when we were showing the district court the likelihood that temperatures would continue to be high and could continue to be high in the month of November, we were relying on the heat index there, not the actual temperature. Well, I mean, I'm sure that that was true back when you tried the case in the district court. But I have a hard time seeing how it's likely that you have a risk between now and November 20. Sure, Your Honor. But again, we're looking at a likelihood of success on the merits here. It does not have to be an absolute certainty in issuing a preliminary injunction. Not so likely, though. And we're looking at a clear error review. So this court, the district court, looked at the data over the course of the last three years and found that there was a likelihood that temperatures could exceed this 88 degree heat alert or heat index thresholds over the course of November. And it issued an injunction that would last until November 20 in light of that risk. Now, this court has to find that that was clearly erroneous in order to second guess that finding that relief was due until November 20. And I'd like to move on to the merits a little bit. I am realizing I have about 30 seconds left. But as to the merits, I'd like to remind this court that, again, all the district court was doing here was requiring defendants to lower their heat alert threshold back to the level that they had maintained for years before this litigation started. They only moved the heat alert threshold back up to 91 after the district court had found that even calling the heat alert at 88 degrees, defendants were still in likely violation of the Eighth Amendment. Now, I see I'm out of time. Thank you, Judge. Appreciate it. And I'd also like to address the remedial measures that defendants discuss in great detail in their briefing. Now, there was a virtual mountain of evidence in the record about those remedial measures. To the extent this court does not see a great deal of discussion of those remedial measures, I'd like to highlight for this court that the issue of whether or not all of these additional fixes that DOC was purporting to implement could outweigh this change from 88 degrees to 91 degrees. It was front and center in the main preliminary... It's just a lot of these issues are just so intertwined in the inevitable trial to occur. Absolutely. And again, I'd like to underscore that the district court heard three days of live testimony on these issues. And this is very tightly bound up in credibility determinations, where our expert was testifying to the risk of 88 degree heat. And even the risk of... There was evidence in the record that people have died from heat-related illness at temperatures of 86 degrees and even lower. And the district court took all of that into consideration when it decided that there was a likely risk of bodily harm and death to these men on the farm line. I'd also like to remind the court, I'm sure you saw in our record excerpts, the chart that shows that not only does risk increase at 88 degrees, it increases almost exponentially. So let's say we do have a heat wave over the next couple of days, the risk is incredibly high. Men with acknowledged... Apologies, I'm out of time. Can I finish this? Men who have impaired thermoregulation, so these are men that DOC has acknowledged have reduced ability to process heat, are still being left outside on the line until temperatures reach 91 degrees Fahrenheit. This poses an unacceptable risk of harm and evinces deliberate indifference under the Eighth Amendment. And we ask this court to affirm. Any further questions? All right. Thank you, counsel. We have your argument. All right. Rebuttal. Back to you, counsel. I'd like to hit just a few points on rebuttal here. One problem that's sort of running through what is or is not included in the August 22nd order, sort of related to your question, Judge Ramirez, about where the findings are in the August 22nd order. Kind of a problem that occurs if we keep issuing successive injunctions that are based off one another. And we kind of pointed out in our opening brief, the May order has since been expired and vacated. It's of no legal effect in this litigation. And yet the August 22nd order takes about 30 pages of the May order and cuts it out and simply says, whatever we said in May, we say here. That doesn't quite make legal or logical sense when you're based off expired and vacated injunctions. As to my friend on the other side's point. Would you address the contention from the other side that no one objected, that the parties essentially did not dispute in the briefing on the motion to renew that nothing had changed or argued for the need for additional hearing or additional findings or evidence? That's correct, Your Honor, in the sense that the facts on the ground had not changed. But that actually supports our position, which is that what occurred in the August 22nd injunction was merely an extension of what had occurred in the May injunction. So the fact that none of the facts or analysis or circumstances has changed meant that we are extending the prior injunction. This is not a new, entirely distinct injunction the way my friends on the other side frame it as. To the protection point and about what LSB's policies look like now. I know my friend on the other side said we haven't codified our new remedial measures that we've been implementing throughout the course of this litigation. But those measures are currently in place with or without the say that this court entered. Since spring of this year, we attached a sworn affidavit to our opposition to the second motion for injunctive relief that the plaintiffs filed. And in that sworn affidavit, it says that we now use 15-minute breaks every 45 minutes. We provide water, ice, shade, breaks whenever requested. We have shade pavilions. We have shade wagons. All of those remedial measures are in place and have been in place for almost this entire calendar year. We did not stop those remedial measures when the district court didn't order them in the vote two injunction. We didn't stop them when the district court didn't order them in the vote three injunction. They are still in place. So to accuse the state of imposing less protective measures is a mischaracterization of the record. And when it comes to that three degree change, our problem with it is it ignores the fact that we have been conducting this holistic response to the district court's orders and the plaintiff's allegations. And that to excise out that change ignores the facts on the ground. But why is the three degrees so cataclysmic to the state? I mean, geez Louise, I mean, nobody denies they're out there on the farm line. I mean, you know, they're in the heat. Yeah, they're prisoners. They're in there for committing some kind of crime. We all get that. The Eighth Amendment piece is not before us per se, right? We're talking about the difference between 88 and 91. And this is scorched earth. Y'all have been here three different times. This is my third go around with this case. I'm not saying that any of that wasn't, you know, well-intentioned and all that. But at bottom, it's about three degrees. That's right. And there is all that climatological data in the record. It's a battle of experts in terms of, you know, the increment between 88 and 91. They have their expert, et cetera, et cetera. You know, I'm not trying to judge it, but I mean, it really is a scorched earth pushback. Not the PLRA part. I'm not going to talk about that. But I'm talking about over the difference between 88 and 91, their argument, well, heat index and there's evidence, you know, does have these other things. I mean, it's the principle. I mean, the three degrees just seems to be within, you know, quote, a margin of error, so to speak. You know what I'm saying? Right. And just like, this was the difference between measuring it 80 degrees and 95 or something. I don't know. Just look like if the gap was bigger, I might see from a practical standpoint, a bigger group. But it seemed like between the margin of error of three degrees, when it doesn't seem like the state, you know, defends that folk can't die, you know, from this. Maybe there's not a question embedded here, but I mean, but you see what I'm saying? I mean, it's three degrees. It's not huge. And so this is what the deal meant. That doesn't displace the Eighth Amendment argument about the four minus seven. Again, even though you have it here, that's really not the need. But for purposes of the state. And I was impressed with that footnote in the OSHA findings that your heat index increases up to 15 degrees if you're working in the sun. So, you know, that gets it up there pretty good. At 88, if you had the 15. Yes, there's two overarching responses to this question of the three degrees. All right. Well, let me put one more piece to it. Sure. No, but it falls to what you just said. You said to us in part just a moment ago, one of the things the district court didn't take into account were the additional mitigating, the ice, et cetera, et cetera. I mean, you said that. Back as far as I can remember, that wasn't in account. So it goes to the question we're asking, if the state was willing to do all these other things that hadn't been asked, the ice, the shade wagon, et cetera, but is pushing so hard on measuring between 88 and 91. You see what I'm saying? Okay. So now you can answer. Yes. And I think there's two parts. One is an overarching PLRA point, which is that our issue with what the district court is doing is that the PLRA's whole purpose was to get federal courts out of the business of micromanaging state prisons. So we see this as the quintessential micromanagement of the state prison because we've made this change, and I'll get to that in a second, of three degrees. And according to the district court, those three degrees are unacceptable. And he's coming in and imposing plaintiff's preferred policy on the state prison. And again, that is quintessential micromanagement forbidden by the PLRA. The second half of that, of why we've changed it, I really encourage your honors to go back and look at the vote one injunction. I know it's expired and I know it's vacated, but both the district court and the plaintiffs kept referring back to the findings that were made at that stage of this litigation. If you look at page 74 and 75 of that injunction, the district court flatly rejected plaintiff's attempt to enjoin all operations on the farm line when the heat index breaches or exceeds 88 degrees. The reason the district court did so was because he acknowledged the fact that labor across the South does not end, does not cease when the heat reaches that level. He also saw in the record, in the evidence, plenty of guidance and manuals saying that, yes, it does become more dangerous when it exceeds 88 degrees, but the only time that that becomes unacceptable is when there are inadequate procedures and protections and measures in place. What he did in the vote one injunction, the two parts of that injunction that were not saved by this court, was tell the state to go increase those protections and increase those measures to make it so that the concerns that were inherent in that excessive heat were ameliorated. That's what the state did. It enacted these sweeping reforms to make work over 88 degrees acceptable and safer. Plaintiffs can disagree with the adequacy of those measures, but when we're talking about an ongoing response to these kinds of violations or these kinds of allegations, what matters is the state's reasonable response and that the risk isn't 100% averted. The Supreme Court said in Farmer v. Brennan that that is not the test. We urge this court to reverse this, again, this micromanagement of the LSP's policies. Well, as one of those talismans, I'm trying to restrain myself from what I want to say because when I was a child growing up in segregated schools, the position of the state was that judges were micromanaging schools to prevent the integration. Every time you say that word micromanage, you're dredging up memories of that, and I guess I'd still be in segregated schools if the courts hadn't. So I mean, that's kind of a, you know, I get the point, but that doesn't seem to be the litigation. But the larger point was asking, you're in effect arguing, because of the other stuff the state did, it minimizes the need to go to measure from 88 to 91. It does, Your Honor. Yeah, I mean, that's what I'm trying to get to. The other part I had to say, because you keep saying micromanaging. And I understand that. That just comes from the sports decisions. I understand. My last question is where we started. November 20th is a trigger date, right? Right. Right now there's a stay that exists. So what happens if November 20th comes and goes and nothing happens? Is this like the other cases that become moot and then the stay is still there? Well, the stay that this court has entered is specific to the August 22nd injunction. So once that injunction expires and then would likely be vacated by this court, then the stay would also have no further effect. There just wouldn't be an injunction. So basically just be back to square one. Not necessarily, Your Honor. Again, because the state is still actively responding to the initial allegations. And there's no reason to think that the state would stop. Like I was saying, we've had these remedial measures in place almost this entire calendar year. Well, that's what I was trying to understand. If all that is the state still doing, would the state still be doing whatever it was doing under the policy in the absence of the state in the case? Is that what you're saying? Yes. My point is that as we've said in our swarm testimony from back in May, we have these measures in place regardless of the temperature outside. So those are going to continue to be in place. One slight caveat, Your Honor, as to the mootness point. I just wanted to put you on notice. We mentioned it in our briefing, but we have filed an en banc petition in the vote to specifically on that mootness issue. So we understand that- Surely you don't think we haven't seen it. I just wanted to be frank with you, Your Honor. I have seen everything. All right. Thank you, counsel, on both sides. Very important case and nothing I've said is meant to minimize that. But we're trying to understand not only the law that's involved, but the on the ground circumstances involved in what's happening. All right. This case will be submitted along with the other cases orally argued today in the in a ways. Having said that, the panel stands in adjournment.